1  Vincent P. Hurley #111215
   Amanda Cohen #243946
2  Ryan M. Thompson #292281
   LAW OFFICES OF VINCENT P. HURLEY
3  A Professional Corporation
   28 Seascape Village
4  Aptos, California 95003
   Telephone:  (831) 661-4800
5  Facsimile:  (831) 661-4804

6  Attorneys for Plaintiff
   MARBLE BRIDGE FUNDING GROUP, INC.
7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10                   OAKLAND DIVISION

11  _____
                                              )  Case No.  4:15-CV-00177-YGR
12  MARBLE BRIDGE FUNDING GROUP, INC., )
                                              )  PLAINTIFF MARBLE BRIDGE FUNDING
13                    Plaintiff,              )  GROUP, INC.'S MEMORANDUM IN
                                              )  OPPOSITION TO DEFENDANTS'
14        vs.                                 )  MOTION TO DISMISS FOR LACK OF
                                              )  PERSONAL JURISDICTION AND
15  LIQUID CAPITAL EXCHANGE, INC.,            )  MOTION TO QUASH SERVICE OF
    LIQUID CAPITAL OF COLORADO, SOL           )  PROCESS
16  ROTER, an individual, and BRUCE DAWSON, )
    an individual.                            )  Date:   March 10, 2015
17                                            )  Time:  2:00 p.m.
                      Defendants.             )  Dept.: Courtroom 1, Fourth Floor
18  _____)  Honorable Judge Yvonne Gonzalez Rogers

19

20

21

22

23

24

25

26

27

28

I.    INTRODUCTION ................................................................................................1

II.   FACTUAL ALLEGATIONS ...............................................................................2

      A.    Facts Alleged in Complaint .......................................................................2
      B.    Excerpts from Depositions.........................................................................3
      C.    Email Correspondence .............................................................................11

III.  LEGAL STANDARD.........................................................................................11

IV.   ARGUMENT .....................................................................................................12

      A.    Defendants Sol Roter, Bruce Dawson and BDB Capital, Inc. Are Subject to
            Personal Jurisdiction in California................................................................12

      1.    In negotiating a "buy-out" agreement and ultimately defrauding Marble Bridge
            Funding Group, Inc., a corporation organized under the laws of California, with
            its principal place of business in California, Defendants Sol Roter, Bruce Dawson,
            and BDB Capital, Inc., purposefully availed themselves of the privileges of
            conducting activities in California ................................................................12

      a.    Wrongful Act ..............................................................................................13

      b.    Expressly Aimed at the Forum State ..........................................................14

      c.    Causing Harm that Defendant Knew or Should Have Known Was Likely to be
            Suffered In the Forum State.......................................................................15

      2.    Plaintiffs' fraud claims against Defendants arise from Defendants' respective
            activities in California ................................................................................16

      3.    Exercising personal jurisdiction over Defendants is reasonable and would not
            offend traditional notions of fair play and substantial justice.........................16

      a.    Extent of Defendants' Purposeful Interjection into California .......................17

      b.    Burden on Defendants in California ............................................................17

      c.    Extent of Conflict with a Foreign Sovereign ...............................................18

      d.    California's Interest in Adjudicating the Dispute .........................................18

      e.    The Most Efficient Judicial Resolution of the Controversy ...........................19

      f.    The Existence of an Alternate Forum ..........................................................19

      B.    Defendant Roter was Properly Served Per the Hague Convention Standards..19

      C.    The Standard for Granting Leave to Amend is 'Generous' and thus, in the Event
            the Court is Inclined to Grant Defendants' Motion to Dismiss, Such Motion
            Should be Granted Without Prejudice ...........................................................22

V.    Conclusion     ...................................................................................................23

i

# **TABLE OF AUTHORITIES**

## ***United States***

*Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995)............................................................11, 16

*Bancroft & Masters, Inc. v. Augusta Nat. Inc.* 223 F.3d 1082 (9th Cir. 2002).........................17

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ................................................................11

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477–478 (1985)..........................12-14, 16-18

*Calder v. Jones*, 465 U.S. 783, 778–790 (1984).................................................................13, 14

*Caruth v. International Psychoanalytical Ass'n*, 59 F.3d 126, 129 (9th Cir. 1995)................19

*Data Disc, Inc., v. Systems Technology Associates, Inc.*,
557 F.2d 1280, 1289, fn.5. (9th Cir. 1977) ..............................................................4, 11, 12

*DeJames v. Magnificence Carriers*, 654 F.2d 280, 288 (3d Cir.1981)...................................21

*Dimensional Communications, Inc. v. OZ Optics Ltd.*,22 ........................................................21

*Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1112 (9th Cir. 2002)..........................14, 17, 18

*Erickson v. Pardus*, 551 U.S. 89, 93 (2007) ..............................................................................11

*Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd.*
328 F.3d 1122, 1129 (9th Cir. 2003) ....................................................................................12

*Hickory Travel Systems, Inc, v, TUI AG*, 213 F.R.D. 547, 553, N.D.Cal. (2003) ...................22

*Hunt's Pier Assoc. v. Conklin*, 156 B.R. 464, 470 (Bankr.E.D.Pa.1993) ................................21

*Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004).......................................................22

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774–775 (1984).........................................13

*McGee v. International Life Insurance Co.*, 355 U.S. 220, 222–223 (1957) ...................13, 14

*Menken v. Emm*, 503 F3d 1050, 1057 (9th Cir. 2007)..............................................................16

*Panavision Intern., L.P. v. Toeppen*, 141 F.3d 1316 (9th Cir. 1998) ......................................19

*Rano v. Sipa Press, Inc.*, 987 F. 2d 580, 588 (9th Cir. 1993) .................................................18

*Sher v. Johnson*, 911 F.2d 1357, 1365 (9th Cir. 1990).............................................................17

*Trump Taj Mahal Assoc. v. Hotel Svces., Inc.*, 183 F.R.D. 173 (D.N.J.1998) ........................21

*Umbenhauer v. Woog* 969 F2d 25, 31 (3rd Cir. 1992) .............................................................22

*United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011)...............................22

*Washington Shoe Co. v. A–Z Sporting Goods Inc.,*
704 F3d 668, 678–679 (9th Cir. 2012) ...................................................................13

### ***International***

Multilateral Service Abroad of Judicial and Extrajudicial Document Convention
done at The Hague, Nov. 15, 1965, 20 U.S.T. 361, Art. 2–7 ............................19, 20

U.S.C.S. International Agreements, at 283 (Law Co-op 1995)
*http:// www.hcch.net/e/status/stat14e.html # ca*
(Canada Accession Notification, Declaration III) .........................................19, 21

R.R.O. 1990, Regulation 194, Rules of Civil Procedure ....................................20, 21

## INTRODUCTION

Plaintiff MARBLE BRIDGE FUNDING GROUP, INC. ("Marble Bridge") is a commercial finance company, organized under the laws of California, with its principal place of business in California, which provides accounts receivable financing to growing businesses that sell their products or services to other businesses. Such commercial finance companies are commonly referred to as "factors".

Defendant LIQUID CAPITAL EXCHANGE, INC. ("Liquid Capital") is a commercial finance company that also does factoring. Defendant SOL ROTER is Liquid Capital's Vice-President, and Defendant BRUCE DAWSON is the president of a franchisee of Liquid Capital Exchange Inc., LIQUID CAPITAL OF COLORADO. Defendants report in their brief that Liquid Capital of Colorado is BDB Capital.

As set forth in Plaintiff's Complaint, in or around November 2010, Defendants unknowingly factored a fraudulent company named Nature's Own. When Defendants discovered the fraud, they demanded that the fraudsters induce a new factor to buy out Liquid Capital by concealing the fraudulent scheme so that Defendants could recoup most of the money paid to Nature's Own. Despite Defendants' respective assertions, each was intimately involved in procuring and ultimately defrauding a new factoring company (Plaintiff) to take over the Nature's Own account.

Defendants have moved to dismiss Plaintiff's complaint for lack of personal jurisdiction, and moved to quash service of process as to Defendant Roter. Alternatively, Defendants' filed a motion to dismiss for failure to state a claim. Defendants' arguments have no merit, and the respective Motions should be denied.

A.     **Facts Alleged In Complaint.**

Plaintiff MARBLE BRIDGE FUNDING GROUP ("Marble Bridge") is a corporation organized under the laws of the State of California with its principal place of business in Walnut Creek, Contra Costa County, California.  Cmplt. ¶1.

Defendant LIQUID CAPITAL EXCHANGE, INC. is a Delaware Corporation with its mailing address in Irving, Texas, and its principal place of business in Toronto, Ontario, Canada, branch franchises or offices in various states in the United States, and it does business in California.  Cmplt. ¶2.  Defendant SOL ROTER is vice-president of LIQUID CAPITAL EXCHANGE, INC., and resides in Toronto, Ontario, Canada.  Cmplt. ¶¶ 4, 9.

Defendant LIQUID CAPITAL OF COLORADO is a business entity of unknown formation with its principal place of business in Broomfield, Colorado.  Plaintiff is informed and believes that Liquid Capital of Colorado is a franchise of Liquid Capital Exchange, Inc., with Defendant BRUCE DAWSON, who resides in Colorado, serving as president.  Cmplt. ¶¶ 3, 5. Both Marble Bridge and Liquid Capital are commercial finance companies that engage in "factoring".  Cmplt. ¶¶ 8, 9.

On or about November 1, 2010, Euler Hermes American Credit Indemnity Company issued Credit Insurance Policy No. 5033862, effective November 1, 2010 to October 31, 2011 (the "Policy"), to Nature's Own, Inc. and Nature's Own LLC, a fraudulent company. Cmplt. ¶16.  Liquid Capital was the finance company and beneficiary of the Nature's Own Policy.  Cmplt. ¶16.

After discovering Nature's Own was a fraud, Roter, Dawson and Liquid Capital entered into an agreement with the other fraudsters and Euler to induce a new factor to buy out Liquid Capital by concealing the fraudulent scheme so that Defendants could recoup most of the money paid to the fraudulent participants.  Cmplt. ¶¶ 18, 19.  On May 9, 2011, unknown to Marble

Bridge, Liquid Capital told Euler agent John Fitzgerald that there were no corroborating addresses for at least two of the fake buyers on the Euler-Nature's Own policy. Cmplt. ¶21.

In negotiating a buy-out agreement with Marble Bridge to take over the fraudulent Nature's Own account, Defendants conspired with Nature's Own fraudster Marsha Holloway aka Anette Zimmerman and only provided Liquid Capital's own generated A/R aging reports through Holloway. Cmplt. ¶22. Roter concealed from Marble Bridge that there had not been any payments. Cmplt. ¶22. The negotiations regarding the buy-out agreement occurred remotely, via telephone, email, and fax exchanges. **Hurley Dec. Ex. H, Mooney Depo. 41:10-43:04.** Marble Bridge conducted all of its negotiations with Defendants at its Walnut Creek, California headquarters. **Hurley Dec. Ex. H, Mooney Depo. 41:10-43:04**.

Defendants, with Holloway's knowledge, prepared falsified financial records misrepresenting that payments had been made on the receivables invoices and that the debts were current when, in fact, the payments were not current, and Roter, Dawson and Liquid Capital knew that the Nature's Own buyers on the invoices did not exist and would never make the payments. Cmplt. ¶23; **Hurley Dec. Ex. I, Holloway Depo. 199:13-205:10.**

In reliance on the representations and unaware of the omissions of Liquid Capital as discussed herein, on or about July 13, 2011, Marble Bridge purchased from Liquid Capital the invoices of Nature's Own buyers, which were subject to coverage under the Policy in an amount in excess of $275,000.00, paying off Liquid Capital. Cmplt. ¶25. As a result of the misrepresentations and omissions of the Liquid Capital defendants with Euler Hermes, Marble Bridge in the next six months purchased over $2 million worth of invoices from the fake Nature's Own buyers and, to date, has lost in excess of $2.8 million as a result of the conduct of Defendants. Cmplt. ¶¶ 26; 35.

### B.      Excerpts from Depositions.

Where a FRCP Rule 12(b)(2) motion challenges the facts alleged, a Rule 12(b)(2) motion must be decided on the basis of competent evidence (usually declarations and discovery

materials).  *Data Disc, Inc., v. Systems Technology Associates, Inc.,* 557 F.2d 1280, 1289, fn.5. (9th Cir. 1977).

The following transcript excerpts are from depositions taken by the parties in *Marble Bridge Funding Group v Euler Hermes American Credit Indemnity Company* and related cases, United States District Court, Northern District of California, Case No. CV12-02729-EJD.

Paul Candau is the Founder, President, and CEO of Marble Bridge.  Excerpts from Candau's deposition are attached as **Exhibit F to the Declaration of Vincent P. Hurley**.

The following sets forth relevant portions of his deposition, taken August 4, 2014, concerning the referral of Liquid Capital from Euler Hermes insurance company to Marble Bridge:

92:20-94:02:

Q.  Now, it states on the first line, "Referred by Euler Hermes."  Do you
    have any personal knowledge as to how that happened?

A.  I'm not sure when you say "personal knowledge."

Q.  Something that you were involved with, you were present when a
    referral -- whatever that means – was made by Euler to Marble Bridge?

A.  I was told by Andrew and I think maybe whoever took a message, but it
    was confirmed in a later conversation with Jonathan.

Q.  I'm asking the source.  You weren't there when the referral took place;
    correct?

A.  Correct.

Q.  So what you know about the -- this referral is what someone else told
    you; correct?

A.  No.  John [Fitzgerald, Euler Hermes agent] confirmed it in
    conversation.

Q.  But the original referral to which you were not present, you did not hear
    that happen, somebody at Marble Bridge -- somebody else at Marble
    Bridge told you about it; correct?

A.  Yes.

Q.  And who was that somebody else?

. . .

THE WITNESS: Andrew.

BY MR. SAULITIS:
Q. Andrew Krone; correct? Anybody else at Marble Bridge inform you,
   tell you that Nature's Own was referred by Euler Hermes?

A. I'm not certain what you're discussing, but Tammy knew and she told
   me, and John knew and he told me, so all three people said the same
   thing.

**Hurley Dec. Ex. F**.

Andrew Krone is the Senior Vice President of Marble Bridge. Excerpts from Krone's

deposition are attached as **Exhibit G to the Declaration of Vincent P. Hurley**. The following

sets forth relevant portions of his deposition, taken August 5, 2014, concerning the referral of

Liquid Capital from Euler Hermes agent John Fitzgerald:

56:06-57:02:

Q. And when next did you have occasion to communicate with John
   Fitzgerald?

A. 2011.

Q. What precipitated that?

A. He made a referral to me of Nature's Own Pharmacy.

Q. When you say "referral" –

A. I got a call in my office from Rick Wallace, Richard Wallace, Nature's
   Own Pharmacy, and he said he was referred by John Fitzgerald of Euler.

Q. So the first call that you received came not from John Fitzgerald, but
   rather someone identifying themselves as Rick Wallace of Nature's Own
   Pharmacy?

A. Richard Wallace, yes.

Q. And in that call, Richard Wallace says to you "John Fitzgerald referred me
   to you," or words –

A. No.

Q. What did Wallace say in that conversation with reference to John
   Fitzgerald or Euler?

A. I had a message from one of my staff members that said that Richard
   Wallace called from Nature's Own Pharmacy, was referred from John
   Fitzgerald at Euler.

76:23-77:02:

> Q. Okay. Now, describe the conversation that took place in that conference room from one to three hours, as best you can recall today. [*During a face to face meeting with criminals Anette Zimmerman and Richard Wallace at the Marble Bridge office.*]
>
> A. We discussed several topics. We talked about their unhappiness with Liquid Capital; she relayed the story that John Fitzgerald had relayed to me about their unhappiness, their desire to find a new financing company. I asked questions about their business, about Rick Wallace, and talked about Marble Bridge and how we operate.
>
> Q. Any other topics discussed?
>
> A. Not that I can recall.

**Hurley Dec. Ex. G.**

Marsha Holloway aka Anette Zimmerman is believed to be one of the masterminds behind Nature's Own. Excerpts from Holloway's deposition are attached as **Exhibit I to the Declaration of Vincent P. Hurley**.

The following sets forth relevant portions of her deposition, taken October 21, 2013, concerning the involvement of the Liquid Capital defendants in the fraud on Marble Bridge:

199:13-205:10:

> Q. What was the extent of your own involvement in these matters?
>
> A. Well, my involvement -- I don't think I talked on the phone to anybody but my involvement was when I got the original -- when Karl [*another of the criminal group*] sent me a copy of the original aging report from Liquid Capital, I said, You're crazy; this is not going to get purchased; there's no way they're going to purchase these old invoices; I don't know what you think you're doing but these invoices are all overdue; every single one is past due and if I were Marble Bridge, I wouldn't buy anything because this is ridiculous. So apparently there was another conversation between Karl and the Canadian Liquid Capital guy and the next document that came to me from Liquid Capital or came from the email -- I don't know who it was emailed to but that I got a copy of that aging report without due dates. The aging report was -- showed the current amount due to Liquid Capital but it did not give any reference to whether they were creditworthy or not creditworthy, meaning they pay on time? How long had you been working with them? Et cetera.
>
> Q. Payment history.
>
> A. Yeah. There was nothing and not your normal aging. It was just a little block.

Q.  It was a slice of what was current?

A.  Yeah.  No, it wasn't anything current. Everything was old but it appeared on current because it said these are the debtors, this is what is owed.  I said, Nobody will buy that  because they're all old, so I don't know how you think you're going to solve this problem.

Q.  Who was the author of the two aging reports that you just described -- the one that had the negative –

A.  Bruce from Liquid Capital.  And during this time –

Q.  He was also the author of the modified aging report that white-washed some of the older –

A.  Yes.

Q.  -- laundry?

A.  Yes.  And while all this process was – the process of getting the Euler documents set up, the process of buying.  Before they bought the invoices, it took time to get the documents back and I don't know what all.  It just wasn't really fast.

    Bruce became a freak, a fanatic blowing up the phone at Nature's, cussing out -- just irate with the receptionist at Regis offices in Elk Grove, calling Euler to see if the beneficiary had been changed and my cell phone as a broker is still on record, has always been on record with Regis because that is the default because I've been a broker for so long.

    When Karl didn't call back or nobody answered, Regis defaulted to me. They never patched through a phone call without permission.  They announce who is calling.  I have -- this is for Nature's Own. I'm calling from Elk Grove.  I have Bruce with Liquid Capital on the phone.  How do you want me to address this call?

    And so when they called me, it was -- I mean, I was taken back because: (a) why were they calling my cell phone number anyway?  They didn't announce who it was.  It was Bruce on the phone screaming so the Regis office just patched it through with no announcement.

    So I have -- I said hello and I have Bruce screaming at the top of his lungs about getting this deal done, who I need to talk to somebody in charge. Where is Rick?

    So I tried to calm him down.  So I told him, I asked him, What is the problem?  And he said, Is this Anette?  And he talked to me before so I had to say yes.

    And he said, Are you in the office?  I said, No.

    He said, Well, I'm sitting out front of your office right now and I demand to see somebody because this is a Regis office.

He had flipped out of his mind. He said, Who is in there that I could talk to? I said, I don't know.

He said that he had had another Liquid Capital agent go to Texas who was just down the road from the Monde office and had gone over there and verified that that too was a Regis office.

Apparently Bruce had paid his own expense on airline tickets and flown to the other locations to determine that they were Regis office. He did not come -- my knowledge -- to Florida. He didn't go to Phantom because that would have been -- it's not a Regis office. It would have been a real business.

But to the other offices he had confirmed that they were all Regis offices. He had apparently driven by all of the warehouses and determined that those were not -- apparently he went to the Nature's Own warehouse, asked them if Nature's Own had any rental space in there, they didn't know of Nature's Own.

So, he had done a lot of investigating to find out that those invoices were bogus, that he was trying to get rid of and in that conversation he said that he has a million dollars of his own money – that the way the franchises work with Liquid Capital is he had to put up a million of his own money, then they back him with more. So of this 200 what ever 60 thousand, he would lose it out of his money and he was just hysterical. I mean, hysterical is a mild word for it. I said I would talk to Rick. And you know, from my understanding, the buyout was supposed to already be done, I would find out and get Rick to get back with him.

So I immediately called Karl and said, you know, You got a major problem and now you've drug me into the middle of this problem and I was just as hysterical as Bruce was. And Karl ended up calling back to Canada talking to the CEO who was apprized of what was going on, knew what Bruce had claimed that these were all Regis offices and this was all bogus accounts and that gentleman agreed with Karl to get the buyout done so they could wash their hands of it and the sooner the better before you, Liquid Capital, threatened to sue Karl. All threaten to sue them, always boast about, you know, if it doesn't go his way, he's going to sue and stop paying. He's got this whole elaborate line of flipping out that he pulls.

But nonetheless, they got Bruce to calm down some how and I don't know who -- I don't think anybody talked to Bruce after that. I believe he continued to blow up people's phones, every customer's phones and he -- but the guy in Canada had kind of curtailed him so they could get this done. When the payout came, they got their money.

Apparently Bruce was entitled to a $10,000 commission of some sort and he had spent $10,000 in airline tickets and travel so he started demanding to Karl and Rick that he get that 20 grand and that they need to pay him or else he was going to tell somebody. You know, he was going to tell this is a fraudulent account.

Karl ended up calling back to Canada, got that curtailed. That went on for a little while -- two, three weeks, finally got that shut up and Karl never paid

8

him any money but it was hushed financial -- that financial arm had passed the hot potato basically.

Q.   Off on to Marble Bridge?

A.   Correct.  And if they had not done that, there would only be a $260,000 loss.  …

**Hurley Dec. Ex. I.**

Tammy Mooney is the Operations Manager at Marble Bridge.  Excerpts from Mooney's deposition are attached as **Exhibit H to the Declaration of Vincent P. Hurley**.  The following sets forth relevant portions of her deposition, taken August 6, 2014, concerning the involvement of Roter and Dawson:

41:10-43:04:

Q.   Were you in any way involved with the take-out of Liquid Capital by Marble Bridge?

A.   Yes.

Q.   How so?

A.   I typed up the payoff letter.

Q.   Any other involvement?

A.   Spoke with Sol Roter.

Q.   Anything else?

A.   Just to get the transaction taken care of so we could pay them off.

Q.   And was Roter in Toronto, as far as you're aware?

A.   I believe so.

Q.   Was there a physical closing of that transaction where people were together in a room signing documents, that is the payoff and transition from Liquid Capital to Marble Bridge?

A.   You mean were we all in the room together?  No.

Q.   You know what a closing is, closing of a deal?

A.   Yes.

Q.   Sometimes it's done in an office, sometimes it's not, sometimes it's done on the telephone, by email, by fax, whatever ways people sign off on things,

1    close, finish.  How was the closing of the Liquid Capital/Marble Bridge deal
     accomplished physically?

2    A.  Email.

3    Q.  So people were where they started, and Marble Bridge was in California and
     Liquid Capital was wherever Liquid Capital was, and people sent emails and
4    did the deal in that fashion; correct?

5    A.  Correct.

6    Q.  There was no physical travel involved?

7    A.  No.

8    Q.  And arranged the deal by telephone, right, and email?

9    A.  Correct.

10   Q.  No one actually met anybody in-person?

11   A.  Not to my knowledge.

12   Q.  Did anybody from Liquid Capital ever travel to or visit the offices of Marble
     Bridge?
13
14   A.  Not to my knowledge.

     Q.  Okay.  Any visit in the State of California in connection with that transaction?
15
16   A.  Not to my knowledge.

17   44:20-45:16:

18   Q.  Now, going back, you became aware that a beneficiary endorsement needed
     to be obtained to replace -- in favor of Marble Bridge such as had previously
19   been in place in favor of Liquid Capital; isn't that correct?

20   A.  Correct.

21   Q.  How did you become aware of that need?

22   A.  I don't recall specifically.

23   Q.  What's your best general recollection?

24   A.  I was aware that Euler Hermes was insuring the receivables.  I had emails, I
     believe, with Anette and Sol Roter, communication regarding changing over
25   the beneficiary as part of getting the payoff and everything to a close, we had
     to have that in position.

26   Q.  And you were the person assigned to make sure that that got done?

27   A.  Correct.

28

Q. Okay. Who gave you that responsibility?

A. It was my account.

Q. Okay. So that was something that came with the territory?

A. Correct.

**Hurley Dec. Ex. H.**

C.     **Email Correspondence.**

Again, where a FRCP Rule 12(b)(2) motion challenges the facts alleged, a Rule 12(b)(2) motion must be decided on the basis of competent evidence (usually declarations and discovery materials). *Data Disc, Inc.*, *supra*, 557 F.2d at 1289, fn.5.

Attached to the **Exhibit J to the Declaration of Vincent P. Hurley** is a true and correct copy of an email, dated July 12, 2011, sent from Defendant Sol Roter to Tammy Mooney of Marble Bridge. Roter writes, in part, that:

"Like most factoring companies it is also not our practice to be distributing much more then an aging report to a competitor taking over one of our clients accounts. We prefer and have been advised that the other factor needs to conduct and reply upon their own due diligence including confirmation of invoices they are purchasing."

**III.**

**LEGAL STANDARD**

Federal Rule of Civil Procedure 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

When defendant's motion to dismiss is made as its initial response and the court decides the motion without conducting an evidentiary hearing, plaintiff need only make a prima facie showing that personal jurisdiction exists. *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). In this context, a "prima facie" showing means that plaintiff has produced admissible evidence

which, if believed, would be sufficient to establish the existence of personal jurisdiction. See

*Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd.* 328 F.3d 1122, 1129 (9th Cir.

2003). Moreover, until an evidentiary hearing or trial on the merits (a) the complaint's

uncontroverted factual allegations must be accepted as true; (b) the court will draw "reasonable

inferences" from the complaint in favor of plaintiff; and (c) any factual conflicts in the parties'

declarations must be resolved in plaintiff's favor. *Harris Rustsky & Co. Ins. Services, Inc.*,

*supra*, 328 F.3d at 1129.

**IV.**

**ARGUMENT**

**A.      Defendants Sol Roter, Bruce Dawson, and BDB Capital, Inc. Are Subject To**

**Personal Jurisdiction in California.**

Where a nonresident defendant's "contacts" with California are not sufficiently

"continuous and systematic" for general jurisdiction, it may still be subject to jurisdiction on

claims related to its activities here. Such "limited" or "specific" personal jurisdiction requires a

showing that:

 (1) The nonresident defendant must do some act or consummate some transaction with

the forum or perform some act by which he purposefully avails himself of the privilege of

conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2) The claim must be one which arises out of or results from the defendant's forum-

related activities; and

(3) Exercise of jurisdiction must be reasonable.

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477–478 (1985); *Data Disc, Inc.*, *supra*, 557

F.2d at 1287.

**1.      In negotiating a "buy-out" agreement and ultimately defrauding Marble**

**Bridge Funding Group, Inc., a corporation organized under the laws of California, with its**

**principal place of business in California, Defendants Sol Roter, Bruce Dawson, and BDB**

12

**Capital, Inc. purposefully availed themselves of the privileges of conducting activities in California.**

"Purposeful availment" is satisfied where defendant committed a wrongful intentional act; expressly aimed at the forum state; causing harm that defendant knew or should have known was likely to be suffered in the forum state. *Washington Shoe Co. v. A–Z Sporting Goods Inc.*, 704 F3d 668, 678–679 (9th Cir. 2012).

An individual's contract with an out-of-state party cannot alone automatically establish sufficient minimum contacts in the other party's home forum. *Burger King Corp.*, *supra*, 471 US at 463. Instead, the prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing, must be evaluated to determine whether a defendant purposefully established minimum contacts within the forum. *Id.*

Personal jurisdiction may not be avoided merely because the defendant did not physically enter the forum State. "Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Id.* at 476. Indeed, the Supreme Court has consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774–775 (1984); see also *Calder v. Jones*, 465 U.S. 783, 778–790 (1984); *McGee v. International Life Insurance Co.*, 355 U.S. 220, 222–223 (1957).

a. <u>Wrongful Act:</u>

After discovering that Nature's Own was a fraudulent company, Defendants Roter Dawson and Liquid Capital entered into an agreement with the Nature's Own fraudsters and Euler to induce a new factor to buy out Liquid Capital by concealing the fraudulent scheme. Cmplt. ¶19. Indeed, there is extensive deposition testimony regarding Defendant Dawson and Defendant Roter's respective involvement in ultimately defrauding Marble Bridge. See **Hurley**

**Dec. Ex. I, Holloway Depo. 199:13-205:10; Hurley Dec. Ex. H, Mooney Depo. 41:10-41:22;**
**44:20-45:16**.  Thus, given that the material facts alleged in the complaint are construed in the light most favorable to the non-moving party, the "wrongful act" prong of the purposeful availment test is satisfied.

     b.    <u>Expressly Aimed At The Forum State:</u>

In *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1112 (9th Cir. 2002), the Court held that where fraudulent communications were intended to induce California managers into a detrimental contract arrangement, and where defendants knew that plaintiff's principal place of business was in California, knew that the decisionmakers for plaintiff were located in California, and communicated directly with those California decisionmakers, defendants actions were "expressly aimed" at the forum state.

Contrary to Defendants' argument that "[a]ny of the limited negotiations that occurred prior to the execution of the Buyout Agreement were between Exchange and Plaintiff," Defendants Roter and Dawson were intimately involved.  Analogous to the facts in *Dole*, Roter, although located in Toronto, Canada, communicated directly with Tammy Mooney, Operations Manager with Marble Bridge in Marble's Bridge's Walnut Creek, California headquarters, in negotiating and eventually agreeing to the buy-out agreement.  **Hurley Dec. Ex. H, Mooney Depo. 41:10-43:04; 44:20-45:16; Hurley Dec. Ex. J**.  The fact that Roter was not physically present in California is inconsequential.  *Burger King Corp., supra,* 471 U.S. at 476; *Keeton, supra,* at 774–775; *Calder, supra,* 465 U.S. 778–790; *McGee, supra,* 355 U.S. at 222–223.

Further, as part of the negotiations regarding the buy-out agreement, Dawson, Roter, and Liquid Capital conspired with Holloway and prepared falsified financial records misrepresenting that payments had been made on the receivables invoices and that the debts were current.  Cmplt. ¶23; **Hurley Dec. Ex. I, Holloway Depo. 199:13-205:10**.  Thus, similar to the fraudsters in *Dole*, Roter, Dawson and Liquid Capital, respectively, were engaged and/or contributed to the negotiations of the buy-out agreement resulting in the ultimate fraud on Marble Bridge, thereby satisfying the second prong of the "purposeful availment test"

1   Finally, Defendants' argument that "it is Plaintiff who reached out to Exchange about the

2   transaction involving Natures Own, not the other way around" (Roter Dec. at ¶14.), is simply

3   incorrect.  As alleged in the Complaint and supported via deposition testimony, upon discovering

4   that Nature's Own was a fraud, Defendants entered into an agreement with Holloway and Euler

5   agent John Fitzgerald to induce a new factor into buying out Liquid Capital on the Nature's Own

6   Account.  Cmplt. ¶¶ 18-25.  John Fitzgerald then reached out to Marble Bridge, referred Marble

7   Bridge to the Nature's Own policy, and put Marble Bridge in contact with Nature's Own

8   fraudsters Zimmerman aka Holloway and Rick Wallace.  See **Hurley Dec. Ex. F, Candau**

9   **Depo. 92:20-94:02**; See also **Hurley Dec. Ex. G, Krone Depo. 56:06-57:02; 76:23-77:02**.

10  Plaintiff and Defendants then worked together in negotiating the buy-out agreement.  **Hurley**

11  **Dec. Ex. H, Mooney Depo. 44:20-45:16**.

12          c.      Causing Harm That Defendant Knew Or Should Have Known Was Likely To Be

13  Suffered In The Forum State:

14          As a result of Defendants' fraudulent conduct, Plaintiff has been damaged in an amount

15  not less than $2.8 million.  Cmplt. ¶35.

16          Defendants argue that they "could not have contemplated future consequences in

17  California because they were not parties to the negotiations or the Buyout Agreement" and that

18  "the terms of the Buyout Agreement do not reference California."  First, as previously set forth,

19  Defendants were indeed key figures in the negotiations regarding the buy-out agreement with

20  Marble Bridge.

21          Second, Defendants cannot, after-the-fact, feign ignorance regarding the location of

22  future consequences of the buy-out agreement and fraud.  Indeed, Marble Bridge is a respected

23  commercial finance company, organized under the laws of California, with its principal place of

24  business in California.  Marble Bridge's negotiations with Defendants regarding the buy-out

25  agreement occurred, via telephone calls, and email and fax exchanges, at Marble Bridge's

26  headquarters in Walnut Creek, California.

27

28

Further, Defendants selectively fail to mention the fact that the buy-out agreement itself, which is attached to Defendants' Motion to Dismiss, has "Marble Bridge Funding Group, Inc." letterhead, contains Marble Bridge's Walnut Creek, California address, and Marble Bridge's Walnut Creek, California area code. Thus, contrary to Defendants assertions, the buy-out agreement itself, even apart from prior negotiations with Marble Bridge officials in California, put the Defendants on "notice" of Marble Bridge's status as a California corporation, and that any consequences from the agreement would necessarily be felt in California. Defendants purposefully availed themselves of the privileges of conducting business in California.

**2. Plaintiffs' fraud claims against Defendants arise from Defendants' respective activities in California.**

The but-for test is utilized to determine whether a particular claim arises out of or is related to forum-related activities and thereby satisfies the second requirement for specific jurisdiction. *Ballard*, *supra*, 65 F.3d at 1500. Here, but for Defendants fraudulent conduct in inducing Marble Bridge to agree to the buy-out agreement of Liquid Capital's account with Nature's Own, Marble Bridge would not have been injured as alleged. Again, Defendants were each intimately involved in defrauding Marble Bridge (**Hurley Dec. Ex. I, Holloway Depo. 199:13-205:10; Hurley Dec. Ex. H, Mooney Depo. 41:10-41:22; 44:20-45:16**), and contrary to Defendants assertions, the fact that Defendants were not physically in California while engaging in the fraudulent conduct is inconsequential.

**3. Exercising personal jurisdiction over Defendants is reasonable and would not offend traditional notions of fair play and substantial justice.**

Under the third and final prong of the "minimum contacts" test, it must appear that the exercise of jurisdiction would "comport with fair play and substantial justice." *Burger King Corp.*, *supra*, 471 U.S. at 477-478. The burden is on defendant to present a "compelling case that the exercise of jurisdiction would not be reasonable." *Menken v. Emm*, 503 F3d 1050, 1057 (9th Cir. 2007).

In determining "reasonableness," courts must consider the following factors: (1) the extent of defendant's "purposeful" interjection; (2) the burden on defendant in defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.  See *Burger King Corp.*, *supra*, 471 US at 476–477; *Bancroft & Masters, Inc. v. Augusta Nat. Inc.* 223 F.3d 1082 (9th Cir. 2002).

     a.    <u>Extent of Defendants' Purposeful Interjection into California</u>

The weaker the plaintiff's showing of purposeful availment and relatedness to forum-related acts, the less a defendant need show in terms of unreasonableness to defeat jurisdiction; <u>and vice versa</u>.  *Burger King Corp., supra*, 471 U.S. at 477.

Defendants entered into an agreement with the Nature's Own fraudsters and Euler to induce a new factor to buy out Liquid Capital.  Cmplt. ¶19; **Hurley Dec. Ex. I, Holloway Depo. 199:13-205:10**.  In conducting the negotiations with Marble Bridge, Defendant Roter, although located in Toronto, Canada, spoke with and sent emails/faxes to individuals at Marble Bridge in California.  **Hurley Dec. Ex. H, Mooney Depo. 41:10-43:04; 44:20-45:16**.  Further, Defendants conspired with Holloway and prepared falsified financial records misrepresenting that payments had been made on the receivables invoices and that the debts were current.  Cmplt. ¶23; **Hurley Dec. Ex. I, Holloway Depo. 199:13-205:10**.  Thus, Defendants' assertion that Defendants' "contacts with California are anything but virtually nonexistent" is disingenuous.  This factor therefore weighs in favor of Plaintiffs.

     b.    <u>Burden on Defendants in California</u>

The mere fact local litigation is inconvenient (or some other forum more convenient) is not enough to sway this factor in any defendants favor.  Litigation locally must be so "gravely difficult" that it puts the defendant at a severe disadvantage in comparison to his or her opponent. See *Sher v. Johnson,* 911 F.2d 1357, 1365 (9th Cir. 1990) (citing *Burger King Corp., supra*, 471 U.S. at 478.  In *Dole Food Co.*, the Court held that it was not unreasonable for California to

assert personal jurisdiction over European defendants who allegedly defrauded a California plaintiff, where it was shown that defendants traveled frequently to the U.S. and were fluent in English.  The burden on defendants and any sovereignty concerns were not controlling.  *Dole Food Co.*, 303 F.3d at 1116.

Here, like the fraudsters in *Dole*, although Defendant Roter is a citizen of Canada, his company does business in the United States.  Indeed, Roter himself, on behalf of Liquid Capital, helped negotiate the $275,000.00 buy-out agreement with Marble Bridge, located in California.  **Hurley Dec. Ex. H, Mooney Depo. 41:10-43:04; 44:20-45:16**.  Liquid Capital is a Delaware Corporation with its mailing address in Irving, Texas, and Defendant Dawson resides in Colorado.  This factor weighs in favor of Plaintiff, as mere inconvenience in defending this matter in California is simply not enough to sway in favor of Defendants.

      c.    <u>Extent of Conflict with a Foreign Sovereign</u>

It is recognized that there is a generally a "higher jurisdictional barrier" required for aliens. *Rano v. Sipa Press, Inc.,* 987 F. 2d 580, 588 (9th Cir. 1993).  Contrary to Defendants assertion that "Mr. Roter has no California-based relationships," Roter's fraudulent actions established lasting, negative connections and relationships with individuals at Marble Bridge in California.  It would not be within "traditional notions of fair play and substantial justice" to allow Roter to use his residency in Canada as a "shield" from defending his fraudulent actions in California or any other state in the United States.

      d.    <u>California's Interest in Adjudicating the Dispute</u>

The state generally has a "manifest interest" in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King Corp., supra*, 471 U.S. 473.  Here, Defendants induced a new factor (eventually Marble Bridge) into buying out Liquid Capital's account with Nature's Own.  Cmplt. ¶19; **Hurley Dec. Ex. I, Holloway Depo. 199:13-205:10**.  Thus, given California's "manifest interest" in protecting its citizens from the tortious conduct of out-of-state actors, this factor weighs in favor of Plaintiff.

e.      The Most Efficient Judicial Resolution of the Controversy

This factor focuses on the location of the evidence and witnesses. *Caruth v. International Psychoanalytical Ass'n*, 59 F.3d 126, 129 (9th Cir. 1995). It is no longer weighed heavily, however, given the modern advances in communication and transportation. *Panavision Intern., L.P. v. Toeppen*, 141 F.3d 1316 (9th Cir. 1998). Here, the majority of the evidence and witnesses are located in California. Thus, this factor weighs in favor of Plaintiff.

f.      The Existence of an Alternate Forum

Plaintiff bears the burden of proving the unavailability of an alternate forum. *Caruth, supra*, 59 F.3d at 126. Plaintiff acknowledges that Colorado or Canada are available as alternative forums. Given the nature of the case and the location of the majority of the evidence and potential witnesses, Plaintiff has a strong preference in litigating this matter in California.

**B.     Defendant Roter was Property Served Per the Hague Convention Standards.**

Contrary to Defendants' argument, Roter was properly served per the Hague Convention Standards.

Attached as **Exhibit B to the Declaration of Ryan M. Thompson** is a true and correct copy of the Hague Service Convention. Article 10 of the Hague Convention states as follows:

Article 10
**Provided the State of destination does not object, the present Convention shall not interfere with –**
a) the freedom to send judicial documents, by postal channels, directly to persons abroad,
**b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,**
c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination**. [Emphasis added].**

Attached as **Exhibit C to the Declaration of Ryan M. Thompson** is a true and correct copy of a list of Canada's objections to the Hague Service Convention, which notes that Canada has only made declarations pursuant to Articles 15 and 16.

Attached as **Exhibit D to the Declaration of Ryan M. Thompson** is a true, correct, and official copy of that portion of Ontario, Canada's Courts of Justice Act R.R.O. 1990, Regulation 194, Rules of Civil Procedure, which provide, in pertinent part, that:

> ***Originating Process***
> **16.01** (1)  An originating process shall be served personally as provided in rule 16.02 or by an alternative to personal service as provided in rule 16.03.
> R.R.O. 1990, Reg. 194, r. 16.01 (1); O. Reg. 131/04, s. 8.
>
> **PERSONAL SERVICE**
> **16.02** (1)  Where a document is to be served personally, the service shall be made,
> **Individual**
> (a) on an individual, other than a person under disability, by leaving a copy of the document with the individual;
> (2)  A person effecting personal service of a document need not produce the original document or have it in his or her possession.
> R.R.O. 1990, Reg. 194, r. 16.02 (2).
>
> **PROOF OF SERVICE**
> ***Affidavit of Service***
> **16.09** (1)  Service of a document may be proved by an affidavit of the person who served it (Form 16B).
> R.R.O. 1990, Reg. 194, r. 16.09 (1).

Attached as **Exhibit A to the Declaration of Ryan M. Thompson** is the Proof of Service of Summons containing the signed affidavit of John Caicedo, stating that he personally served Sol Roter in Toronto, Canada on December 15, 2014, prior to the removal of this action to this Court.  The Proof of Service of Summons was filed on December 26, 2014 at the Contra Costa County Superior Court, prior to removal of this action to this Court.  Thus, based on the Hague Convention, Canada's laws and regulations regarding service, and the manner of service on Roter, Roter was indeed properly served.

When faced with the identical question in New Jersey, District Judge Bassler correctly ruled as follows:

> "The principal method for service of judicial documents abroad, as set forth in Articles 2 through 7 of the Hague Convention, is through a designated Central Authority, who in turn either serves the documents or arranges to have them served by an appropriate agency.  *See* Multilateral Service Abroad of Judicial and Extrajudicial Documents Convention done at The Hague, Nov. 15, 1965, 20 U.S.T. 361, Art. 2–7.  This, however, is not the only acceptable method of service under the Convention.  As recognized by the Third Circuit, the Hague Convention permits alternate channels of service so long as they are

not objected to by the receiving State. *DeJames v. Magnificence Carriers,* 654 F.2d 280, 288 (3d Cir.1981); *see also Trump Taj Mahal Assoc. v. Hotel Svces., Inc.,* 183 F.R.D. 173 (D.N.J.1998).

For example, service may be effected through diplomatic or consular agents of the sending State (Art. 8); through consular channels to authorities within a contracting State who are authorized by that State to effect service (Art. 9); through the judicial officers, officials, or other competent person of the State of destination (Art. 10); pursuant to any other agreement between the States involved (Art. 11); or pursuant to the internal law of the receiving State for documents coming from abroad (Art. 19).

Here, [plaintiff] contends that it complied with Article 10(b) of the Hague Convention when, through a process server in Ontario, it personally effected service of the summons and complaint on the Vice President of [defendant corporation] OZ Optics Canada, Jim Burke. Article 10 provides that if the State of destination does not object, service may be effected by judicial officers, officials or other competent persons of the State of origin directly through judicial officers, officials or other competent persons of the State of destination. Hague Convention, at Art. 10.

Canada has not availed itself of the opportunity, as provided under Article 21,1 to object to Article 10(b)'s service provision. In fact, on accession, Canada affirmatively stated that it does not object to the methods of service set forth in Article 10(b) and (c). U.S.C.S. International Agreements, at 283 (Law Co-op 1995); *see also http:// www.hcch.net/e/status/stat14e.html # ca* (Canada Accession Notification, Declaration III).

Courts have also looked to the internal service rules of the destination State to determine whether that State would object to the particular method of service utilized under Article 10. *Hunt's Pier Assoc. v. Conklin,* 156 B.R. 464, 470 (Bankr.E.D.Pa.1993).

The applicable Ontario rule of civil procedure is Rule 16 regarding Service of Documents. Rule 16.01(1) requires that originating process (i.e., the summons and complaint) shall be served personally under Rule 16.02 or by alternative to personal service provided in Rule 16.03. Rule 16.02(1)(c) provides, as to personal service on a corporation that is not a municipality, that such service shall be made 'by leaving a copy of the document with an officer, director or agent of the corporation, or with a person at any place of business of the corporation who appears to be in control or management of the place of business. . .' service clearly complied with Rule 16.02(1)(c). Accordingly, this Court concludes that Ontario, Canada would not object to the method of service utilized by [plaintiff] here."

*Dimensional Communications, Inc. v. OZ Optics Ltd.*, 218 F.Supp.2d 653, 655-657 (D.N.J. 2002).

Although Plaintiffs maintain that service of Roter was proper, nonetheless, dismissal of a complaint on the ground that process was not properly served is inappropriate when there exists a reasonable prospect that service may yet be obtained; in such instances, district court should, at

most, quash service, leaving plaintiffs free to effect proper service. See *Hickory Travel Systems, Inc, v, TUI AG*, 213 F.R.D. 547, 553, N.D.Cal. (2003) citing *Umbenhauer v. Woog* 969 F2d 25, 31 (3rd Cir. 1992).

### C. The Standard for Granting Leave to Amend is 'Generous' and thus, in the Event the Court is Inclined to Grant Defendants' Motion to Dismiss, Such Motion Should be Granted Without Prejudice.

Assuming, *arguendo*, that the Court is inclined to grant Defendants' Motion to Dismiss, Federal Rules of Civil Procedure 15(a) expressly states leave to amend "shall be freely given when justice so requires." FRCP 15(a); *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011) —standard for granting leave to amend is "generous." The court considers five factors in assessing the propriety of leave to amend—bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint. *Johnson v. Buckley,* 356 F.3d 1067, 1077 (9th Cir. 2004).

Here, there has been no evidence of bad faith or undue delay on Plaintiff's part. As set forth in Plaintiff's Complaint, Plaintiff sued Euler Hermes American Credit Indemnity Company and two of the criminals, Marsha Kay Holloway and Richard Wallace, in the United States District Court, Case No. CV12-02729-EJD and Related Case No. CV12-01839 EJD, for their acts and omissions regarding the insuring and ensuring payments and credit limits for fraudulent companies and criminals. Cmplt. ¶11. When Plaintiff discovered the acts and omissions of Defendants in the instant matter, Plaintiff moved to add the Liquid Capital actors in the federal actions, but that motion was denied. Cmplt. ¶12. Plaintiff therefore sues Defendants in this action.

Further, although Plaintiff contends that the complaint is more than sufficiently plead, amending the complaint would provide Plaintiff the opportunity to provide more specificity regarding Defendants' respective involvement in negotiating the buy-out agreement as shown herein. Finally, granting Plaintiff's leave to amend would not prejudice Defendants, as there have been no prior amendments to Plaintiff's Complaint.

1

**V.**

2

**CONCLUSION**

3      For the foregoing reasons, Plaintiff Marble Bridge Funding Group, Inc. respectfully

4  requests that the Court issue an order (1) denying Defendants' Motion to Dismiss and (2)

5  denying Defendants' Motion to Quash.

6

7  Dated:  February 3, 2015

8                                                      LAW OFFICES OF VINCENT P. HURLEY
                                                       A Professional Corporation

9

10                                                     By:  _____/s/ Ryan M. Thompson_____
                                                              RYAN M. THOMPSON
                                                             Attorneys for Plaintiff
11                                                     MARBLE BRIDGE FUNDING GROUP, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pltf's Opp to Defts' Mot to Dismiss re Jurisdiction and Mot to Quash Service            Case No.  4:15-CV-00177-YGR